### SIMMONS CO. v. SUPERIOR FELT & BEDDING CO.
### No. 6886.

Circuit Court of Appeals, Seventh Circuit.

Nov. 18, 1939.

George I. Haight, Cyril A. Soans, and William E. Anderson, all of Chicago, Ill., for plaintiff-appellant.

C. Paul Parker, Alwin F. Pitzner, and Lincoln B. Smith, all of Chicago, Ill., for defendant-appellee.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

latter was issued June 27, 1933, on an ap-

Appellant charged appellee with infringement of United States Patents to Gail, Nos. 1,677,232 and 1,915,659, which had been assigned to appellant. The former patent was issued July 17, 1928, on an application filed October 3, 1927, and the plication filed February 15, 1930. The defenses were invalidity and non-infringement. The District Court held that the first patent was valid but not infringed. It held the second patent invalid and did not pass upon the question of infringement. From that decree this appeal is prosecuted.

Claim 1 of the first patent was in issue. It is a method claim and relates to the manufacture of mattresses or cushions in which the side edge of the mattress, or like article, is equipped with a strip of ticking disposed more or less in a vertical plane so as to give what is generally described as a box effect. The side and end strips of ticking are commonly called a boxing. With respect to the first patent, Gail's object was to provide a mattress having a box with means for resiliently maintaining said boxing in a stretched, vertical condition, and to prevent bulging thereof outwardly; to provide a mattress and boxing therefor which would be durable and maintain its desired shape and position during the life of the mattress or like article. These objects he claimed to have accomplished by devising a new method of connecting the upper and lower edges of the spring core directly to the boxing, so as to eliminate excess thickness of padding between the boxing and the spring construction, thereby causing the springs to act directly on the boxing by stretching and maintaining the same in a vertical position at all times. By such method he also claimed to have effected a seal between the boxing and the outer edges of the spring core so as to prevent any part of the filling at the top and bottom of the mattress from working or leaking into the space between the boxing and the spring core. He claimed to have accomplished these objects by tieing the outer rows of springs to the boxing, as a result of which the boxing was always stretched vertically and was free from bulging. Preferably the outer row of springs was placed under a slight compression so as to insure a positive stretching effect at all times.

Claim 1 is as follows:

"The improvement in the art of manufacturing a mattress having springs incorporated in the filling adjacent the edge of the mattress for maintaining the verticality of the boxing, which consists in making the boxing, connecting the springs to the inner face of said boxing, completing the formation of the body or filler of the mattress, applying the horizontally extending portion of the mattress casing and then sewing the edge of the boxing thereto."

The sides and ends of the mattress which comprise the box are made of a three-ply structure. The outer ply, which is referred to as the boxing strip, is preferably made either of the same material as the top and bottom ticks of the mattress, or of a material which properly matches them. The inner ply, called the liner strip, may be of ordinary cotton sheeting. The middle ply is of fibrous filling material such as felted cotton. This three-ply structure is referred to as quilted boxing and is generally made up in large quantities in advance to be used as needed in the construction or assembly of the complete mattresses or cushions.

To assemble the mattress, the core or body, comprising the strips of spring-filled pockets assembled and connected together, is placed on a suitable table or support, and a length of boxing strip is applied around the outside of the core. The inner liner strip is then connected to the outer row of springs by means of ties which may be of any type, but the preferred type employed is a long length of suitable cord which by means of a needle is hitched or knotted around the top of the hemmed edge of the inner strip and the top coil of the spring in the outer row.

After the outer rows of springs have been thus connected to the edges of the boxing around the outer edge of the mattress, the usual upper and lower layers of padding are applied, after which the edges of the tick strip of the boxing are sewed to the adjacent edges of the upper and lower tick parts, after which the main body of the mattress is tufted in the usual manner. In the case of a reversible mattress, both sides are constructed in the same manner as last above stated.

Appellee's mattresses embody an inner spring structure or core having on both its top and bottom sides a layer of padding material over which a sheet of ticking is placed, the edges of which are sewed to the outer fabric of the boxing. Between the boxing and the border wire of the spring structure there is interposed a pad which is formed of a fabric tube filled with felt material, the pad being folded longitudinally upon itself and then attached to the boxing by stitches which pass through both folds of the pad and entirely through the boxing where the stitches appear on the outside of the mattress. The two-fold lobes, formed by the folding of the pad, project downwardly and are utilized to perform several functions. They are passed around the border wire of the spring structure and their edges are clipped together by metal clips so that the border wire is completely enclosed between the lobes which form a cushion about the wire to

prevent it from being easily felt through the boxing. These lobes also serve as links to connect the boxing to the spring structure. The upper filled portions of the pad occupy the corner portion of the mattress adjacent the juncture of the boxing, and the top ticking serves to fill out and re-enforce this corner. Being anchored, this pad cannot work out of place and permit the corner parts of the mattress to get out of shape.

The inner fabric lining of the appellee's boxing, as originally manufactured and sold, was found by appellee to serve no mechanical purpose, that is to say, it was not used in any respect as a means of fastening or connecting the boxing to anything, and it was therefore eliminated. The connector pads in appellee's mattress were fastened by stitches passing entirely through the boxing. This was found necessary to give sufficient strength for anchorage to the stitches; especially was this true after the inner lining of the boxing was eliminated.

Appellee contends that the first patent is invalid in view of the following prior art: Farrow and Goodman, No. 1,205,135; Hale, No. 854,161; Hampton, Nos. 935,844, and 958,116; Burton, No. 977,508; Burrows, No. 1,279,510; Lang and Van Derveer, No. 1,336,525; and Fuld, No. 1,576,738. It is unnecessary to examine these references in detail. It is not denied that Gail was working in a very narrow field, and it is obvious that his accomplishments quite closely approached the realm of mechanical skill.

This patent, however, bears the presumption of validity, and a study of these references does not convince us that the claim is invalid when strictly limited to its express terms. That is to say, it must be so interpreted as to require the springs of appellant's mattress to be connected only to that part of the boxing which is referred to as the inner lining. This construction, we think, is fair in view of the fact that the claim expressly says so, and appellant has heretofore stressed the advantage of that requirement, in that no part of the connection is shown on the outside of the boxing. This conclusion, we think, is unquestionably verified by the file wrapper with reference to the rejection of original claim 26 and the substitution of claim 27, as an amendment, which is the same as claim 1 now before us. We think, the court did not err in thus limiting claim 1 and holding it valid.

The question of infringement, therefore, is narrowed to the proposition whether appellee's structure infringes by extending the anchorage of its spring clear through the outer wall of the boxing. We think this question must be answered in the negative. Original claim 26 was similar in substance to the present claim 1, except that in broad language it called for "securing the springs to the boxing." The commissioner rejected it on the patent to Farrow and Goodman, No. 1,205,135, which patent shows springs connected to the body of the boxing by cords or other suitable means. Subsequently Gail acquiesced in this rejection by cancelling claim 26 and substituting claim 27, which is identical with claim 1 now before us, and calls for "connecting the springs to the inner face of said boxing." In support of this substitution he submitted the following argument:

"Claim 27, which is offered as a substitute for original Claim 26, is not anticipated by any of the references cited or considered for the reason that in none of the references is there any suggestion of the idea of connecting a row of springs *to the inside facing* of a boxing prior to the completion of the body of the filler and the closing of the mattress by sewing the top tick portion to the edge of the boxing. In the Farrow patent ·the roll-edge ties which secure the spring structure *to the edge of* the mattress are applied after the filling and the closing of the mattress have been completed. In Applicant's disclosure the advantages of applying or connecting the springs *to the inner face* of the boxing prior to the subsequent completing operations are obvious. *This method is of especial value* in a mattress of Applicant's type, as it enables the connections to be applied in *proper location,* without resulting in an *unkempt or other undesirable appearance of the outside of the finished mattress.*

"In mattresses such as disclosed in the Bennett or Rhodes patents, the filling *is* introduced into the completed casing by the usual mattress stuffing machine. Furthermore, there is nothing to suggest that the filling is connected *to the inner face* of the boxing either before or after the incorporation of the filling in the mattress casing." (Italics supplied.)

Appellant insists that the change which avoided Farrow and Goodman was

in securing the inner face of the boxing to the springs prior to the closing operation which was emphasized in claim 26 and is not specifically referred to in claim 27 or claim 1. However, the sequence is the. same in each, for in appellant's construction the inner face of the boxing is not accessible after the closing operation. It seems obvious, therefore, that the only significant change was the connection of the springs to the inner face of the boxing. Having acquiesced in ·this limitation, appellant cannot now eliminate it. We think that the District Court did not err in holding there was no infringement of claim 1.

### The Second Gail Patent.

In Gail's first patent here in issue, he disclosed corner edges extending around the mattress at top and bottom, and finished with what is called an outside roll edge. This edge was made by inserting diagonal ties or stitches through the corner as a part of the exterior treatment of the mattress after this casing had been applied and sewed. Mattresses finished without the use of these diagonal stitches to form the outside roll edge were known as French edge mattresses. The roll edge proved to be objectionable in that it was both laborious and expensive to make, was subject to distortion by handling or use, and it resulted in the formation of a dust-catching groove or crevice in which dirt and vermin might collect. To overcome these objections was the design of the second Gail patent. His principal object thereby was to provide a square edge mattress of the French edge type adapted to inner spring construction and made in accordance with the method of the first Gail patent.

In the second patent Gail described how a pair of inside rolls, for re-enforcing the corner edges, were produced as an incident to the manufacture of a pre-built padded boxing, which boxing, with the rolls at-tached to its margins to form a unitary structure, was used in the assembly in accordance with the method of the first patent. Thus, as stated by appellant, there was a substantial re-enforcing element to each edge of the mattress which was resiliently supported by the resilient mattress filler, or core. He also stated that the expansive pressure of the resilient filler tended to rock the edge re-enforcing rolls around their connections to the side wall structure, so there was a tendency to bend or fold the opposite marginal portions of the side wall structure outwardly around their connections; that the top and bottom ticks normally had a tendency to pull the respective upper and lower edges of the side wall structure inwardly, making the boxing bulgy in appearance, which was effectively counteracted and overcome by the filler roll edge, aided by the expansive pressure of the resilient mattress filler, or spring core.

Appellant relies upon claims 1, 3, 4, 6, 7, 8, 9, 10, 11, 16, 18, 19, 20 and 21, and on number 18 as fairly representative of all the claims.[1] So far as we can observe, the structural features of both patents are the same except that the second patent discloses a French edge mattress instead of a roll edge mattress, and that in the second patent, there are inserted filler pads within the mattress around the edges or corners to re-enforce and hold the corners in shape, thus performing the same service as the roll edges did in the first patent. These filler pads are sewed to the boxing and positioned to lie above and below the marginal row of springs of the spring core. They are made of soft felt material which is readily compressible. They are not secured in any manner to the spring structure but merely bear against the ends of the marginal row of springs, being held in position solely by the stitches which secure the pads to the boxing.·

---

[1] "18. A mattress of the square edge type comprising a top tick member, a side or border strip extending around the mattress and connected at its top edge to said top tick member, a border row of coil springs intermediate said top and the bottom of the mattress for resiliently distending the same, and a filler strip of padding material extending longitudinally of said border strip adjacent the top margin thereof and secured thereto at points spaced downwardly from the top edge of both said border strip and said filler strip, the major portion of the thickness of said filler strip projecting inwardly from the normal plane of said border strip so as to preserve the squareness of the mattress edge and said strip forming a downwardly facing shoulder for engaging the end coils of the springs, the latter tending to rock said filler strip around its connection with said border strip so as to counteract the inward pull normally applied to the upper edge of said border strip by the top tick member, thereby to maintain the verticality of said border strip."

It is contended by appellant that these pads, due to their size and the character of their substance and their stitched connection to the boxing, give a so-called rocking action to them which assures a prompt return to their original position when any weight is removed from them. The evidence supporting this contention is, to say the least, not overwhelming. It seems to us to amount to nothing more than a re-enforcing roll as disclosed by much of the prior art.

Appellant further argues that there is virtue in the fact that these rolls or pads are stitched to the boxing before it is associated with the spring core. A study of the prior art, to which we will refer presently, convinces us that there is nothing new in the idea of pre-forming any part of a mattress. Moreover, the claims before us now are drawn to the structure and not to a process and we doubt if such argument is here pertinent. On the question of pre-forming with respect to the mattresses, we think Gail has disclosed nothing more than Fuld, No. 1,576,738. That patent further disclosed corner re-enforcing rolls secured to the upper and lower marginal portions of the spring structure, and stitches securing the padding and ticking to the corner border wires of the spring structure. Ackley, No. 373,711, disclosed everything which this patent discloses, except that it made no mention of stitches for fastening the roll in position. However, the fastening of corner rolls in position was quite old in the art, and the mere use by appellant of stitches to fasten the roll in position seems to us not to rise above the dignity of mechanical skill.

It is quite true that Ackley disclosed a non-reversible product. This is likewise true of Hale, No. 854,161; Hampton, Nos. 935,844 and 958,116; the prior use of John M. Smyth Company, and many other prior art structures. Reversibility, however, is accomplished merely by duplicating the upholstery of the two sides of the product, and this was disclosed by the prior patents of Bergman, No. 250,875; Fuld, No. 1,576,738; Farrow and Goodman, No. 1,205,135, and many other prior art structures. The use of a pad or roll in the corner portion of the mattress for the purpose of re-enforcing the corner and maintaining its shape is quite old in this art. If appellant by this use has acquired a rocking motion which more quickly restores the mattress to its original shape, we think it is due to the increased size of the pad or roll which is used. The change is one of degree and not of principle, and we do not understand that there is validity in such a disclosure. Any substance of a resilient character, such as the padding of a mattress, will restore itself so long as the resiliency lasts; and if one end of it is fastened, the other is bound to move in an arc when pressure is released. This accounts for what appellant chooses to call the rocking motion and it will be present more or less in any size padding of a similar character, and the size of the roll used by appellant no doubt causes the so-called rocking motion which he here stresses. We think the claims relied upon in the second patent are invalid, and the decree of the District Court in this respect is correct.

We are further of opinion that appellee's structure does not infringe the second patent in view of the Hampton patents, for in them the corner re-enforcing rolls were secured to the border wire of the spring structure just as in appellee's mattress, whereas in the Gail patent the corner pads were not attached in any way to the spring structure, and the second Hampton patent disclosed the idea of pre-forming a boxing with a re-enforcing roll attached thereto before assembling.

Decree affirmed.